UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PHILIP SHEN, et al.,

Plaintiffs,

v.

ALBANY UNIFIED SCHOOL DISTRICT, et al.,

Defendants.

Case No. 3:17-cv-02478-JD

**ORDER RE SUMMARY JUDGMENT ON QUALIFIED IMMUNITY AND STATE LAW CLAIM**

Re: Dkt. No. 199

This case arises out of actions taken by the Albany Unified School District ("AUSD") and its employees in response to racist and derogatory content posted on an Instagram account by several students at Albany High School ("AHS"). Plaintiff Philip Shen was one of the students associated with the postings. The individual defendants are Valerie Williams, the former superintendent of AUSD; Jeff Anderson, the former principal of AHS; and Melisa Pfohl, a former assistant principal at AHS.

The factual details about the Instagram posts are provided in the Court's earlier summary judgment order, which resolved plaintiffs' First Amendment and related state law claims. Dkt. No. 109. After other orders, *see* Dkt. Nos. 191, 198, and settlements, all that remains in the litigation are Shen's claims for: 1) unreasonable seizure under the Fourth Amendment (Claim 5); 2) state-created danger under the Fourteenth Amendment (Claim 7); and 3) state-created danger under Article I, Section 7 of the California Constitution (Claim 8). Dkt. No. 112 (First Amended Complaint).

These claims are based on events that occurred when Shen returned to AHS after being suspended for involvement with the Instagram account. The events included a student "sit-in" demonstration and a "restorative justice" meeting. The meeting was arranged by school administrators, and brought together the students who were the victims of the posts and the

students who participated in the Instagram account, such as Shen. It was a day of high emotion and agitation at AHS, and Shen was punched in the head by another student.

Defendants filed a summary judgment motion for qualified immunity to the federal constitutional claims. Dkt. No. 199. Qualified immunity is granted for all defendants on the Fourth Amendment claim. It is denied on the Fourteenth Amendment claim for Williams and Anderson, but granted for Pfohl. Defendants also sought summary judgement on a parallel state law claim, which is granted.

**LEGAL STANDARDS**

Parties "may move for summary judgment, identifying each claim or defense -- or the part of each claim or defense -- on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may dispose of less than the entire case and even just portions of a claim or defense. *Smith v. Cal. Dep't of Highway Patrol*, 75 F. Supp. 3d 1173, 1179 (N.D. Cal. 2014). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it could affect the outcome of the suit under the governing law. *Id*. To determine whether a genuine dispute as to any material fact exists, a court must view the evidence in the light most favorable to the non-moving party and draw "all justifiable inferences" in that party's favor. *Id.* at 255. This is because the purpose of summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

The individual defendants assert qualified immunity on the federal constitutional claims. Qualified immunity is "an immunity from suit." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). It "balances two important interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. A public official is entitled to qualified immunity unless "(1) the facts adduced constitute the violation of a constitutional right; and (2) the constitutional right was clearly established at the time of the

2

alleged violation." *Mitchell v. Washington*, 818 F.3d 436, 443 (9th Cir. 2016). The first prong "calls for a factual inquiry" while the second is "solely a question of law for the judge." *Dunn v. Castro*, 621 F.3d 1196, 1199 (9th Cir. 2010) (citation omitted). "[B]oth prongs must be satisfied for a plaintiff to overcome a qualified immunity defense." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017).

"The linchpin of qualified immunity is the reasonableness of the official's conduct." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1075 (9th Cir. 2011) (citing *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987)). Qualified immunity does not demand absolute perfection from officers in the performance of their duties. So long as the challenged conduct was objectively reasonable in light of the legal rules prevailing at the time it occurred, the officer will be immune from suit. *See id.* at 1075-76 (quoting *Creighton*, 483 U.S. at 638-39). "Summary judgment on qualified immunity is not proper unless the evidence permits only one reasonable conclusion." *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1087 (9th Cir. 2000).

Shen alleges the same factual allegations for the federal and California state-created danger constitutional claims. Because qualified immunity is a federal doctrine, it does not bar potential state law liability. *Venegas v. Cty. of Los Angeles*, 153 Cal. App. 4th 1230, 1243 (2007) (citing *Ogborn v. City of Lancaster*, 101 Cal. App. 4th 448, 460 (2002)).

**DISCUSSION**

**I. FOURTH AMENDMENT**

The Fourth Amendment prohibition against an unreasonable seizure applies "in the school context, [but] the reasonableness of the seizure must be considered in light of the educational objectives." *Doe ex rel. Doe v. Hawaii Dep't of Educ.*, 334 F.3d 906, 909 (9th Cir. 2003). The qualified immunity analysis must take into account the fact that the Constitution's protection against unreasonable searches and seizures already builds in an allowance for reasonable error. *Rosenbaum*, 663 F.3d at 1076 n.1; *see also Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014) ("To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949))).

3

The record establishes, without any genuine dispute of fact, that Shen was not subjected to an unreasonable seizure. "Such a seizure occurs when there is a restraint on liberty to the degree that a reasonable person would not feel free to leave." *Doe*, 334 F.3d at 909. This "requires an intentional acquisition of physical control." *Brower v. Cty. of Inyo*, 489 U.S. 593, 596 (1989). There is no evidence that occurred here. Shen testified at his deposition that attendance at the restorative meeting was not mandatory, and that he participated because he "thought it would be productive." Dkt. No. 201, Ex. A, ECF pp.16-17. He also testified that he went out to see the students in the sit-in at the suggestion of some of the victims of the Instagram account, adding that he "didn't mind" complying with the request. *Id.* at 29. Later that day, when some of the suspended students left school, Shen chose to stay because he "wanted to finish the schoolday [*sic*]." *Id.* at 35-36.

These facts demonstrate that Shen was never "seized" for Fourth Amendment purposes. Shen tries to overcome this by saying that defendants' actions had the effect of trapping him in a conference room surrounded by hostile students, but that is not enough to make out a Fourth Amendment violation. "To constitute a seizure, the governmental conduct must be purposeful, and cannot be an unintentional act which merely has the effect of restraining the liberty of the plaintiff." *Nelson v. City of Davis*, 685 F.3d 867, 876 (9th Cir. 2012).

Consequently, defendants are entitled to qualified immunity for the Fourth Amendment claim. While the consolidated complaint describes Shen's Fourth Amendment claim as an excessive force issue under *Graham v. Connor*, 490 U.S. 386 (1989), his opposition to the summary judgment motion treated it purely as a matter of an unreasonable seizure. Even if the excessive force claim had been developed and argued beyond the complaint, which did not happen, it would stumble on the second prong of the qualified immunity test -- the need for a clearly established right. *See Pearson*, 555 U.S. at 236 ("The judges of the district courts and courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."). The Supreme Court has held that *Graham*'s objective reasonableness standard "is far too general a proposition" to constitute clearly

4

established law sufficient to overcome a qualified immunity defense. *City & Cty. of San Francisco v. Sheehan*, 575 U.S. 600, __, 135 S. Ct. 1765, 1775 (2015).

Although qualified immunity bars only suits for money damages against the individual defendants, *Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012), the grant of qualified immunity here resolves the Fourth Amendment cause of action *in toto*. Declaratory and injunctive relief are "only available in an official capacity suit," *Wolfe v. Strankman*, 392 F.3d 358, 360 n.2 (9th Cir. 2004), and the Court has already dismissed the claims against defendants in that capacity, Dkt. No. 191 at 9.

## II. FOURTEENTH AMENDMENT -- STATE-CREATED DANGER

The outcome is different for the state-created danger claim under the Due Process Clause of the Fourteenth Amendment. As the Court determined in the order on defendants' motion to dismiss, it is clearly "established that state officials may be liable under the Fourteenth Amendment's substantive due process clause 'in a variety of circumstances, for their roles in creating or exposing individuals to danger they otherwise would not have faced.'" Dkt. No. 191 at 6 (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006)). A "state-created danger" claim has three elements: "First, [the plaintiff] must show that the officers' affirmative actions created or exposed [him] to an actual, particularized danger that [he] would not otherwise have faced. Second, [he] must show that the injury [he] suffered was foreseeable. Third, [he] must show that the officers were deliberately indifferent to the known danger." *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019). These are required showings because members of the public as a general rule do not have a "constitutional right to sue [public] employees who fail to protect them against harm inflicted by third parties." *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992) (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989)).

The record demonstrates that Williams and Anderson "affirmatively place[d] the plaintiff in danger by acting with deliberate indifference to a known or obvious danger." *Pauluk v. Savage*, 836 F.3d 1117, 1122 (9th Cir. 2016) (internal quotation and citation omitted). They engaged in

5

conduct as school administrators that foreseeably led to Shen's injuries. This is sufficient to make out a violation the Fourteenth Amendment, and preclude a finding of qualified immunity.

### A. Former Superintendent Williams

Williams put Shen in a position of danger by widely disseminating on March 30, 2017, the day of his return to AHS, a message about a suspected noose. Williams broadcast an email to "Albany Students, Staff, Parents, and Community" stating that the "Albany Police Department notified the Albany High School administration early this morning that they are investigating a report of a rope that looked like a noose tied to a tree in the park next to the school, and another piece of rope was found across the street from the high school." Dkt. No. 204, Ex. B, ECF p.13. Williams recognized the distress her message would likely cause by stating in the email that school administrators had "increased" the availability of "mental health support" to students in need. *Id*. Williams also said that the administration was aware "that high school students are planning a sit-in to take place some time during the school day as a show of solidarity." *Id.* Williams sent another email about an hour later reporting that the police had determined the rope was only a swing. Dkt. No. 204, Ex. C, ECF p.15. In the second email, Williams said "we know that our original message may have caused concern in our community, [but] I wanted to get initial information about the report to everyone in a timely manner." *Id.*

Given the highly charged atmosphere at AHS, and the offensive racial content of the Instagram posts, spreading a rumor about a suspected noose near AHS was like throwing a match into a powder keg. Williams and other school administrators knew that the AHS student body was already in a state of high agitation over the Instagram account, and the record underscores that students and parents were on edge. On March 29, 2017, for example, the night before Williams sent the emails, she got an email from an AHS parent with the subject line "Alert re tomorrow." It attached a screenshot of a text which said that the suspended students "should not be let back into our school," and were "fucking racists." Dkt. No. 200, Ex. F, ECF p.28-30. Other administration emails described the sit-in as a "protest [of] the return of the offenders," Dkt. No. 202, Ex. A, ECF p.8, and warned staff to "be extra vigilant about their [i.e., Shen and other suspended students'] safety," Dkt. No. 205, Ex. E, ECF pp.29-30. In a separate email to school trustees on

6

March 30, 2017, Williams wrote, "I was originally asked not to communicate with the community until [the Albany Police Department] did more investigating, but I told them that there was no way I could not send something out in the next few minutes." Dkt. No. 206-5 at ECF p.1.

A reasonable school official in Williams's position would have realized that widely disseminating an unverified report of a noose would exacerbate the possibility of harm to Shen and the other account perpetrators on campus. Williams's actions meet the three requirements for a state-created danger outlined in *Martinez*. Sending the emails was an affirmative act that created a reasonably foreseeable likelihood of increased danger to the Instagram account participants. Williams knew about the charged atmosphere at the school, and expressly ignored a recommendation by the police that she not send the email before the investigation was completed.

The requisite mental state has also been established. Deliberate indifference requires that Williams "recognized an unreasonable risk and actually intended to expose [Shen] to such risks without regard to the consequences." *Hernandez v. City of San Jose*, 897 F.3d 1125, 1135 (9th Cir. 2018) (citation omitted). Williams need not have intended that Shen be assaulted, but only have been aware of the dangerous effect her email about the noose would have on the student body. That state of mind has been established by the evidence just discussed.

The next inquiry for qualified immunity is whether Williams's conduct violated a right clearly established as of March 2017. *See Morales v. Fry*, 873 F.3d 817, 823 (9th Cir. 2017). While this "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (internal quotation and citation omitted).

There is no question that Shen had a right not to be placed in danger by the state and its officers in March 2017. The opinion in *Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006), established that. In *Kennedy*, the plaintiff told a police officer that she was concerned her neighbor's son had molested her daughter. Because she was afraid of the neighbor family, she was promised by the officer that "she would be given notice prior to any police contact" with the neighbor about the allegations. *Id.* at 1058. The officer did not honor that promise, and the neighbor, after hearing about the allegations, became "very angry" and "had begun to yell" before

7

the officer left. *Id.* The next morning, the son shot the plaintiff and killed her husband. The Ninth Circuit found that these circumstances warranted a denial of qualified immunity because while "the state's failure to protect an individual against private violence does not generally violate the guarantee of due process, it can . . . where state action creates or exposes an individual to danger which he or she would not have otherwise faced." *Id.* at 1061 (citation omitted). The defendant officer had created a danger because the neighbor was "notified of the allegations before the [plaintiff and her family] had the opportunity to protect themselves from his violent response to the news." *Id.* at 1063.

So too, here. Although the consequences here were substantially less dire -- an assault as opposed to murder -- *Kennedy* squarely fits Shen's claim. By 2016, two years before the events giving rise to this lawsuit took place, *Kennedy* had established that an officer cannot "stoke[] the violent tendencies of a dangerous" person. *See also Hernandez*, 897 F.3d at 1137. That the specific circumstances in *Kennedy* were different from the ones here is of no moment. "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

### B. Former Principal Anderson

Anderson is also not entitled to qualified immunity on the Fourteenth Amendment claim. Anderson took charge of the events at the end of the "restorative justice" meeting, and made a series of decisions that raised the level of danger to Shen at AHS.

As the parties acknowledged in their briefs, the decision in *Hernandez* provides substantial guidance here. *Hernandez* affirmed a denial of qualified immunity for police officers who "directed [plaintiffs] into the mob of violent protestors" outside a then-Presidential candidate Donald J. Trump rally in 2016. *Hernandez*, 897 F.3d at 1129. Like Shen, one of the plaintiffs in that case was hit in the head by a member of a riled-up crowd. *Id.* at 1130. While *Hernandez* was published after the events in this case, it involved facts and law that existed prior to the situation at AHS. Consequently, it is applicable to this motion.

Shen contends that Anderson's affirmative act was taking charge of escorting Shen and others out of the meeting. "In examining whether an officer affirmatively places an individual in

8

1  danger, we do not look solely to the agency of the individual, nor do we rest our opinion on what
2  options may or may not have been available to the individual. Instead, we examine whether the
3  officers left the person in a situation that was more dangerous than the one in which they found
4  him." *Munger*, 227 F.3d at 1086. That is what happened here. Anderson took charge of the exit
5  strategy, and led the suspended students out of the school. Dkt. No. 200 ¶¶ 36, 38; *see also* Dkt.
6  No. 202 (Decl. of Assistant Superintendent Peter Parenti) ¶ 15 ("I went back to the Main Office
7  and discussed with Principal Anderson how the suspended students were going to leave that day.
8  An Albany police officer and parents of some of the suspended students were also present and
9  participated in the discussions.").

10  The record establishes that Anderson was deliberately indifferent to the foreseeable risk
11  that Shen would be assaulted or harmed by agitated students. Once again, the volatile situation at
12  AHS is not in dispute. From the moment the Instagram account had been revealed, "knowledge of
13  the account and its content was spreading like wildfire and upsetting not only students but the
14  entire community." Dkt. No. 205 ¶ 13. Anderson's assistant principal, co-defendant Pfohl,
15  described the discovery of the account as "a nuclear bomb going off at our school." *Id.* Between
16  the revelation of the Instagram account on March 20, 2017, and March 30, 2017 -- the date of the
17  events at issue here -- there were multiple meetings and discussions about the postings involving
18  students, parents, and staff. Dkt. No. 200 ¶ 26. Anderson recognized that "aggressive action
19  toward returning students" from the rest of the student body was a distinct possibility and that
20  measures would have to be taken to ensure "the physical and emotional safety of both the victims
21  and the followers." *Id.* ¶ 19. After having reviewed the text messages attached to the "Alert re
22  tomorrow" email, "rumors of the student sit-in were concerning to [Anderson]. [He] was hoping
23  that it would not occur." *Id.* ¶ 28.

24  Approximately an hour after the restorative meeting ended, which was around noon on
25  March 30, 2017, Anderson talked with an Albany police officer, other administrators, and at least
26  one parent about how to get Shen and the other suspended students out of the school safely. Dkt.
27  No. 200 ¶ 36. They did not act on an exit plan until around 4:00 p.m., *id.* ¶ 38, shortly after school
28  let out at 3:32 p.m. Dkt. No. 205, Ex. G, ECF p.34. There is no explanation for why Anderson

waited approximately four hours after the conclusion of the meeting, when students would be out of classes and roaming the halls, to escort the suspended students outside of the school. Shen was assaulted while being escorted to a waiting van.

In a draft email to Albany students, parents, and staff that Anderson sent to a district administrator for review the next day, he wrote, "We decided to have the students exit through the gym lobby because there was [*sic*] no news crews," and he took "responsibility for not better managing the events." Dkt. No. 206-7 at ECF p.1.

Taken as a whole, the record indicates that Anderson knew "that something is going to happen" but he elected to ignore that immediate "risk and expose[] the plaintiff to it." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011) (citation omitted). "The deliberate-indifference inquiry should go to the jury if any rational factfinder could find this requisite mental state." *Id.*; *see also Kennedy*, 439 F.3d at 1064-65.

At the time of these events, it was clear that "the state-created danger doctrine applied to the crowd-control context." *Hernandez*, 897 F.3d at 1138 (citing *Johnson v. City of Seattle*, 474 F.3d 634, 640-41 (9th Cir. 2007). *Johnson* has established that state actors could be liable if they confined a plaintiff "to a place where they would be exposed to a risk of harm by private persons," *Johnson*, 474 F.3d at 640, and *Hernandez* gives "the center of an unruly mob of protestors," *Hernandez*, 897 F.3d at 1138, as an example of such a location. One teacher described the scene at AHS facing Shen and other suspended students as they were being escorted out of the school in the following way: "When we entered the Gym Lobby doors a large group of students met us. The Gym Lobby was extremely crowded and the students were being loud and some were calling the followers racists." Dkt. No. 203 ¶ 13.

The record places this case closer to *Hernandez* than *Johnson*, where the plaintiffs "voluntarily placed themselves in the midst of the crowd that subsequently became unruly." *Johnson*, 474 F.3d at 640. As in *Hernandez*, "[b]eing attacked . . . was only a possibility when [Shen] arrived at [school]. [Anderson] greatly increased that risk of violence when [he] shepherded and directed [Shen] towards the unruly mob." *Hernandez*, 897 F.3d at 1134.

Anderson "created a danger [Shen] otherwise would not have faced," violated Shen's clearly established constitutional right, and is not entitled to qualified immunity. *Id.* at 1135.

### C. Former Assistant Principal Pfohl

Shen brought a state-created danger claim against Pfohl, but he has not pointed to any evidence showing that she violated his constitutional rights. His opposition to the summary judgment motion says only that Pfohl told Williams "that the police were investigating the possible presence of a noose" near AHS. Dkt. No. 206 at 3. Pfohl did not create "a foreseeable injury" by reporting an ongoing police investigation to her supervisor. *Lawrence v. United States*, 340 F.3d 952, 957 (9th Cir. 2003). Shen presents no other facts with respect to Pfohl, and so qualified immunity is granted.

## III. CALIFORNIA CONSTITUTION -- STATE-CREATED DANGER

Shen asserts the same state-created danger claim under Article I, Section 7 of the California Constitution. But he has not identified any case law or other authorities demonstrating that California recognizes the claim. Simply alleging that the "California Constitution's due process clause mirrors that of the United States and requires defendants, and each of them, to protect students from third parties when they themselves acted to create the danger" is not enough. Dkt. No. 112 ¶ 163. While the two constitutional provisions may be similar, they are not identical, *see Katzberg v. Regents of Univ. of Cal.*, 29 Cal. 4th 300, 320-21 (2002), and it is emphatically not the role of this federal court to create new doctrines under the California state constitution. In light of the absence of any apparent foundation in California state law, this claim is dismissed.

## CONCLUSION

Qualified immunity is granted for all defendants on the Fourth Amendment claim. It is denied for the Fourteenth Amendment claim for Williams and Anderson, but granted for Pfohl. Summary judgment is granted for all defendants on the parallel California Constitution claim.

**IT IS SO ORDERED.**

Dated: January 29, 2020

JAMES DONATO
United States District Judge

11